IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

NITZA I. COLON-FONTANEZ,

**Plaintiff,**

**v.**                                   CIVIL NO. 07-2142 (FAB)

MUNICIPALITY OF SAN JUAN; JANE
DOE AND JOHN DOE COMPANIES X,
Y, Z,

**Defendants.**

OPINION & ORDER

BESOSA, District Judge

On September 12, 2008, plaintiff Nitza I. Colon-Fontanez ("Plaintiff" or "Colon-Fontanez") filed an amended complaint against defendant Municipality of San Juan ("Defendant" or "Municipality") and other unknown defendants[1]. (Docket No. 48) In her amended complaint Colon-Fontanez alleged: (1) that the defendants discriminated against her on the basis of her disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq* and in violation of the Rehabilitation

_____

[1] Plaintiff had 120 days from the filing of her complaint to substitute unknown defendants with actual defendants, unless she provided good cause for an extension. See Fed.R.Civ.P. 4(m). Plaintiff has had ample time to amend her complaint and to serve process on proper defendants but has failed to do so without positing good cause. The Court therefore dismisses all unknown defendants.

Act, 29 U.S.C. § 701 *et seq*;[2] (2) that the defendants retaliated against her in violation of the anti-retaliation statute under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq*; and (3) that the defendants violated the equal protection clause of the United States Constitution.[3]   Colon-Fontanez also attached supplemental Commonwealth claims pursuant to Article 1802 of the Puerto Rico Civil Code, Law No. 115 of December 20, 1991 and Law No. 44 of July 2, 1985.  On August 31, 2009 the Municipality filed a motion for summary judgment (Docket Nos. 158, 159, and 162). Colon-Fontanez opposed the Municipalitys motion on September 21, 2009 (Docket Nos. 180, 177, 187, 203, 204, and 207).   The

---

[2]   Although Colon-Fontanez fails to invoke any particular section of the Rehabilitation Act in her amended complaint, the Court proceeds to analyze the ADA and Rehabilitation Act claims under the same standards.  See, e.g., Calero-Cerezo v. U.S. Dept. of Justice, 355 F.3d 6, 12 (1st Cir. 2004).

[3]   Colon-Fontanez fails even to mention an equal protection claim either in the section of her amended complaint which sets forth her causes of action or in any subsequent pleading. Furthermore, Colon-Fontanez never alleges any facts related to this claim or any related legal analysis.  The Municipality does not address an equal protection claim anywhere.  Courts need not and should not make determinations based on "merely articulated rather than actually articulated" arguments.  McCoy v. Massachusetts Institute of Technology, 950 F.2d 13, 22 (1st Cir. 1991).  As the First Circuit Court of Appeals once put it, "Overburdened trial judges cannot expect to be mind readers."  Id.  The Court therefore deems this unarticulated equal protection claim MOOT.

Municipality replied to Colon-Fontanez's opposition on October 16, 2009 (Docket Nos. 213, 214, 215 and 216).[4]

For the reasons provided below, the Court **GRANTS** the Municipality's motion for summary judgment.

## I.    Rule 56 and Filing Procedures

Local Rule 56 requires parties to support a motion for summary judgment with a statement of material facts.  Loc.Civ.R. 56(b).  Critically, it also requires a party opposing summary judgment to submit an opposing statement of facts that either admits, denies or qualifies the movant's proposed facts "*by reference to each numbered paragraph of the moving party's statement of material facts and unless a fact is admitted, shall support each denial or qualification by a record citation*."  Loc.Civ.R. 56(c) (emphasis added).  Both rules require the parties to submit "separate, short and concise" statements of fact in numbered paragraphs that are supported by pin cites to admissible evidence.  Loc.Civ.R. 56(b), (c) & (e).  As a general principle, parties may not include legal arguments or conclusions in their statement of facts.  See <u>MVM Inc.</u>

---

[4] Also outstanding is a Motion in Limine to Exclude Testimony and Report (Docket No. 197) filed on October 4, 2009 by the Municipality, Colon-Fontanez's Response in Opposition (Docket No. 211) to that motion and the Municipality's Reply (Docket No. 236) to the plaintiff's opposition. Because the Court does not consider the issue of whether Colon-Fontanez suffered from an actual disability pursuant to the ADA, it need not determine whether Colon-Fontanez's expert testimony and report is admissible. The Court therefore finds the Motion in Limine and related briefs MOOT.

v. Rodriguez, 568 F.Supp.2d 158, 163 (D.P.R. 2008); Juarbe-Velez v. Soto-Santiago, 558 F.Supp.2d 187, 192 (D.P.R. 2008).

Both parties failed to comply with this rule.  In fact, there are so many instances of error related to Rule 56 or, better put, disregard for Rule 56, that the Court hardly knows where to start or how to articulate its discontent sufficiently to provoke counsel for both parties to make serious changes in their future approaches to filing and writing summary judgment pleadings.

**A. The Municipality's Motion for Summary Judgment and Conventional Filing**

The Municipality filed electronically a "Notice of Filing Exhibits Conventionally" (Docket No. 160) and proceeded to provide this Court and opposing counsel with hard copies of all documents submitted as exhibits in support of the motion for summary judgment.  Yet the Municipality failed to follow procedures required for conventional submission properly, according to the Manual for Civil and Criminal Cases of CM/ECF.  See Id., Part IV(B) at 27.  To comply with the filing requirements, the Municipality should have filed electronically its notice of conventional filing "as an attachment of the main document those exhibits supports." Id.  Further, the Municipality should have filed those exhibits with the Court, accompanied by the notice of conventional filing, so that the "Clerk's Office will note on the docket its receipt of the documents(s) or exhibits(s) with a text-only entry."  Id.  The Municipality failed to file the supporting exhibits with the Court,

and hence there is no entry by the Clerk noting on the record of this case the substitution of conventional filing by the defendant.

The Court had **DIRECTED THE MUNICIPALITY'S COUNSEL TO FILE ITS EXHIBITS WITH THE COURT, ACCOMPANIED BY ITS NOTICE OF CONVENTIONAL FILING,** so that the Clerk of the Court may enter on the docket its receipt of the documents with a text-only entry. The Court proceeds to adjudicate the motion for summary judgment, however, because the Court noted on the record the Municipality's conventional filing of documents (Docket No. 164) and its receipt of the courtesy copies provided to it by the Municipality's counsel.

This instruction to file conventional documents properly with the Clerk for recording on the case docket, however, does not end the Court's discussion of improper filing by the Municipality regarding its summary judgment motion.  The Court must also address the problems inherent in the organization and presentation of the conventionally filed documents.  The Municipality provided the Court with hard copies of the exhibits filed in support of its summary judgment motion in three large binders.  The Statement of Uncontested Facts in Support of Defendant's Motion for Summary Judgment (Docket No. 159) explains:

> Most documents produced by Defendant during discovery are
> bates-stamped as 'MSJ' followed by successive numbers 1
> through 2326.  Each fact asserted will be referenced to
> a letter exhibit number plus a bates stamp number, if
> there is one, and a deposition number, if there is one.
> A translation of each document will follow the original

document.  A list of exhibits is attached with lettered
Exhibits from A through Z.

Unfortunately, this clear explanation of the exhibit
organization proves theoretical.  In fact, the Court is unable to
find many of the cited documents.  The three large binders
submitted to the Court are tabbed and separated by lettered
exhibits (A, B, C), but the Statement of Uncontested Facts refers
also to specific numbered exhibits, for example D1 and D2, which
are generally not separated or tabbed in any way.  Instead, the
Court must look through hundreds of pages within each lettered tab
section to search for the numbered exhibits sited in the Statement
of Uncontested Facts.  Further, the Municipality explains that each
cited fact may be located by reference to its "bates-stamp number"
from 1-2326.  The problem is that the bates-stamped documents in
the binders are neither tabbed nor are they ordered from 1-2326 or
any other detectable order.  When the Court seeks to find, for
example, "Exhibit H-1, MSJ 693" among many unseparated pages, the
document with the bates-stamp of 693 follows a document with a
bates-stamp of 461 (which, in turn, follows a document bates-
stamped as 464) pursuant to a list which, itself, is difficult to
find.

The point is that while the documents may be bates-
stamped with a number, the Municipality's effort is meaningless
because the documents are not ordered according to their bates-
stamp, making the binders a mess of papers for the Court to sort

through.  That citation system is extremely difficult to follow, and demands that the Court waste much time searching through the record in search of cited materials.  See generally, Calvi v. Knox County, 470 F.3d 422, 427 (1st Cir. 2006) ("Such local rules are useful devices for focusing a district court's attention on what is-and what is not-genuinely controverted."); Morales v. A.C. Orssleff's EFTF, 246 F.3d 32, 33 (1st Cir. 2001).

### B.   Colon-Fontanez's Opposition

The Court turns next to Colon-Fontanez's opposition to the summary judgment motion.  In numerous instances, Colon-Fontanez admits a fact, then subsequently denies or qualifies that same fact.  Worse, throughout its opposition to the Municipality's Statement of Uncontested Facts, Colon-Fontanez denies or qualifies each single fact submitted by the Municipality improperly, in multiple paragraphs, often spanning multiple pages; in those paragraphs Colon-Fontanez raises new facts or addresses facts other than those submitted by the Municipality.[5]  All of these exemplify what *not to do* in facts submitted in opposition to a motion for summary judgment.  See Rios-Jimenez v. Principi, 520 F.3d 31, 38 (1st Cir. 2008).  Rule 56 provides the party opposing summary judgment with an opportunity to submit additional facts, set forth

---

[5]   Both parties submitted compound facts in their factual statements.  Rule 56 (c) requires parties to submit numbered paragraphs containing a single fact each - not, as parties here have both done, paragraphs containing multiple facts for the Court's consideration.

in a separate section; it does not permit new facts to be raised in the section set aside for admitting, denying or qualifying the movant's facts.  In this case Colon-Fontanez's opposition to each fact submitted by the Municipality exceeds proper length requirements implicated by Rule 56 and goes beyond the scope of the fact submitted by the Municipality, in effect submitting new facts not relevant to the fact being contested.  The Court disregards entirely all of these improperly submitted new facts.

   **C.   The Municipality's Reply Brief**

        Approximately one third of the Municipality's reply memorandum (Docket No. 216) consists of the exact same arguments - verbatim - that were made in its motion for summary judgment.  A reply memorandum "shall be strictly confined to replying to a new matter raised in the objection or opposing memorandum." Loc.Civ.R. 7.1 (c).  Accordingly, the Court disregards all sections of the reply memorandum which unabashedly lift and paste language previously used in the motion for summary judgment.  Worse still, counsel for the Municipality asked for and was granted permission to exceed length requirements set forth by the local rules, only to inundate its reply memorandum with lengthy repetition of arguments previously made to the Court.  (See Docket Nos. 219, 222, 223.)  In doing so, counsel exploited the Court's desire to accommodate all potentially new arguments and then wasted the Court's time.

**D.   Citation, Translation, Relevance, and Admissibility**

As for citation issues, the Municipality correctly notes in its reply to Colon-Fontanez's statements of contested and uncontested material facts (Docket No. 177) that Colon-Fontanez often improperly supported her proposed facts by failing to include a page number.  The Municipality, however, fails to cite to the record properly in its reply to the Colon-Fontanez's Uncontested Material Facts.  Many paragraphs of the Municipality's Reply simply cite to "Reply Exhibit 1", a multi-page exhibit with no page numbers to assist in its analysis.  (Docket No. 213 at 101-104)

As for translation issues, the Court will not admit to the record any facts supported by exhibits which consist of a partially translated document rendered incomprehensible or which cannot be verified by virtue of the lacking context.  The Municipality submits various documents, such as business reports or records, without translations of key sections of the document, making it impossible for the Court to credit these documents for the purpose of admitting the facts those documents purport to support.  Submitting sections of a document or deposition is proper only when the materials submitted are clear without the entire document or context.  That is not the case here, where the partially translated materials were unclear without their context. Because the Court fears being mislead by the fragments submitted or misunderstanding the meaning of those fragments, it will only

consider supporting exhibits whose meanings are clear without a context or on their face.

The Court also notes that numerous exhibits were not translated whatsoever and will therefore not be considered.  See Puerto Ricans for P.R. Party v. Dalmau, 544 F.3d 58, 67 (1st Cir. 2008); Local Civil Rule 10(b).  Colon-Fontanez, in particular, failed to translate numerous exhibits upon which significant facts alleged in Counter Statement of Facts are based.  No translations were submitted for Exhibits 1, 17, 18, 20, 21, 23, 31, 33, 35, 37, 38, 39, 41, and 42.  Any fact alleged by Colon-Fontanez that is based on an untranslated exhibit will be disregarded.

As for admissibility issues, Colon-Fontanez and the Municipality both accuse the other of proposing facts that are not properly admissible due to hearsay issues, lack of authentication, relevance or otherwise.[6]  In fact, an outstanding motion on admissibility remains:  the parties have submitted motions accusing the other of various kinds of improper filing.  **The Court finds both Colon-Fontanez's Motion to Strike Exhibits Filed in Violation to Rule 56 (Docket No. 232) and the Municipality's Motion to Strike the Plaintiff's Motion (Docket No. 233) as MOOT.**  Instead of

_____

[6]  The Court wishes to remind the parties that Local Rule 56 obligates a party opposing summary judgment to admit, deny or qualify a proposed fact.  Loc.Civ.R. 56(c).  It does not ask whether the party contests a proposed fact or finds it to be relevant or material.

cataloging and discussing each occurrence of improperly supported
fact or each issue of admissibility, many of which are irrelevant
to the Court's analysis of the summary judgment motion, the Court
chooses simply to include in the factual background of this opinion
only facts that are relevant, properly supported, and admissible
for the purposes of its review at this stage of the proceedings.
Because the Court's findings make many of the contested areas of
fact irrelevant, numerous facts submitted by the parties are
omitted.   Nevertheless, the Court does include some facts not
critical to its analysis where necessary to create a cogent
presentation of the context in which the dispute arose.

In sum, the Court urges both parties to read Rule 56 and
case law pertaining to that Rule carefully.   The length of
pleadings submitted by both parties is absurd and results in a
grave waste of judicial resources; the acrimonious language and
histrionic tones contained in those pleadings makes all arguments
appear less trustworthy in the eyes of the Court; and the
replacement of quantity for quality causes the Court great
consternation because it attempts to peel back all of the
unnecessary muck seemingly thrown at the proverbial wall of this
Court to see what sticks.

## II.  Factual Background

Colon-Fontanez has been employed by the Municipality since
1989.  She was a temporary worker until March 16, 1992 when she was

reclassified to a regular position.[7] Colon-Fontanez's position

changed a number of times during her employment at the

Municipality: on March 2, 1999 the Municipality reclassified Colon-

Fontanez from "Office Clerk II" to "Office Systems Assistant I"

which included a pay raise; On April 15, 2001, the Municipality

reclassified Colon-Fontanez to "Administrative Officer I," which

included an increase in salary; on June 30, 2006, Colon-Fontanez

was appointed "Auction Officer,"[8] which became effective

retroactively on May 1, 2005.[9]

Jose Alicea Rivera ("Alicea") was, for many periods relevant

to this case, the Municipal Secretary and the President of the

Municipality's Auction Board.[10] Ivonne Rodriguez ("Rodriguez") is

_____

[7] The Court will only admit facts properly cited to the
record. The exhibit attached describing the reclassification of
plaintiff's employment only includes the title of her position
prior to her reclassification. Although it is possible that
plaintiff's position title remained the same following her
reclassification from transitory to regular employee, the Court
only includes the fact that she was reclassified and not the
proposed position titles given by both parties.

[8] Colon-Fontanez's pay was adjusted at the time of this
reclassification to reflect money owed as a result of her
retroactive reclassification and adjustments due to her exhaustion
of her leave balances.

[9] The Court notes that Colon-Fontanez's allegation that she
in fact was already performing the tasks of "Auction Officer" for
a period of about seven years from February 1998 through at least
March, 2005, which is a reason cited by the Municipality for its
decision to reclassify the plaintiff as an Auction Officer
retroactively.

[10] Alicea became the Municipal Secretary in January 2007.

the Director for the Purchases and Bids Department.  She supervises Colon-Fontanez, who is an Auction Officer.[11]  Julia Lanzo was the manager of the Auction Department beginning approximately in 2000. Maria Marcano and Julia Lanzo both supervised Colon-Fontanez during periods relevant to this case.  James Delgado holds the position of an auction official.  According to the testimony of Julia Lanzo, Delgado was the second in command in the auction department, and would sign documents as the acting manager if Lanzo herself was away.  Jose Rivera-Hernandez ("Rivera") was the Special Assistant of the Municipal Secretary from August 2001 until July 2008. Rivera's duties included making sure that the persons parked in the Municipal Tower's parking lot were authorized to park there.

The Municipal Tower building houses the Auction Department, where Colon-Fontanez worked.  The building is accessible to a multi-floor parking building.  The Municipality pays rent for 400 parking spaces used by its employees in the multi-floor parking building adjacent to the Municipal Tower building.  The

---

[11]  The names of the department where Colon-Fontanez worked within the Municipality's structure and the names of various positions held by Municipality employees are not translated consistently throughout the evidentiary materials submitted. Because these title designations do not affect the Court's findings in this case the Court can safely create internal consistency for the purpose of cogency in this opinion.  The Court will thus refer to the department in which Colon-Fontanez worked as the Auction Department and to Colon-Fontanez's position at the time she requested accommodation as Auction Officer.  In other instances where translations are inconsistent, the Court makes similar adjustments for coherency.

Municipality pays $40.00 and the employee pays $20.00 for each rental.  The Municipal Tower building has approximately seventy-five (75) parking spaces in the main building.

Colon-Fontanez was diagnosed with fibromyalgia in 2005.[12] Colon-Fontanez testified that she informed both supervisors Rodriguez and Lanzo of her diagnosis.  Lanzo testified that Colon-Fontanez claimed to suffer from many ailments during the years that Lanzo supervised Colon-Fontanez, including fibromyalgia.[13]  Colon-Fontanez claims that her condition causes bodily pain that makes it difficult for her to walk from the multi-floor parking lot to the Municipal Tower building where she worked.

Colon-Fontanez testified that she is generally scheduled to work from 8:00 a.m. to 4:00 p.m.  On numerous occasions during her tenure at the Municipality, however, Colon-Fontanez's supervisors

_____

[12] Though the parties contest the validity of Colon-Fontanez's diagnosis, the Court includes the fact of her diagnosis to explain the basis for her claim; whether Colon-Fontanez was disabled pursuant to the ADA is irrelevant because the Court has found that she is not qualified under the ADA on other grounds.

[13] Colon-Fontanez brings forth additional evidence regarding a prior health condition (epilepsy) as a way to address her substantial absences during the years of her employment prior to the diagnosis of the disability (fibromyalgia) alleged here.  The fact remains that her employer gave her leave and approved her absences without sanction or recrimination.  Thus, whether Colon-Fontanez's prior health issues unrelated to the disability alleged here contributed to her attendance problems is a question that is unrelated to the complaint allegations and will not be considered. Furthermore, the various health issues suffered by Colon-Fontanez in the many years during her employment at the Municipality are not the subject of her the EEOC proceedings, nor are they the basis for any retaliatory allegations in this case.

would temporarily shift her work schedule to accommodate her
absences.

### Colon-Fontanez's Duties as Auction Officer

As Auction Officer, Colon-Fontanez has the duties described in
a "Position Description" document submitted for the record. Those
duties include, *inter alia*, preparing requests for bid proposals,
preparing bid notices, directing administrative work related to
bids and proposals, submitting bid proposals for recommendations,
evaluating recommendations and submitting them to the Bid Board,
preparing award notices, and preparing contracts. To perform the
described duties, the Auction Officer must be physically present in
the auction department, located in the Municipal Tower building,
particularly during the pre-auction period and the opening of an
auction, and because the auction papers may not be removed from the
auction office premises.

### Colon-Fontanez's Attendance Record and Work Performance

The Municipality's policies state that all its employees must
regularly and punctually attend work and comply with their
established work schedules. The Municipality allows for certain
kinds of leave related, among other things, to illness.

During her tenure of employment at the Municipality, Plaintiff
Colon-Fontanez's attendance record has been irregular. Colon-
Fontanez has been frequently absent from work or tardy, allegedly
due to illness, medical appointments and other approved forms of

leave.  During some periods of her employment, the number of leave days taken by Colon-Fontanez exceeded the amount of leave allowed by the Municipality, resulting in the docking of pay or other losses.  The Municipality's attendance manual states that career employees are entitled to accrue sick leave "proportional to the number of hours comprised by the assigned work schedule." Regarding excess sick days, the Municipality's manual states that "sick leave can be accrued up to a maximum of ninety (90) working days by the end of any calendar year."

The Municipality's *Manual Regarding Work Schedule, Attendance Registry, Accrual and Use of Leave*[14] states that the Municipality will consider an employee's illness or injury and a death or serious illness in an employee's immediate family as a possible justification for absence or tardiness.  The Manual also states that the Municipality may take disciplinary measures when an employee incurs in a violation of established attendance norms and use of leaves of absence such as being absent from work frequently and regularly on the days proceeding or following weekends or holidays or being absent for nine days during a period of three consecutive months.

---

[14]    The Court notes with disapproval the Municipality's selective translations of the *Manual*, leaving out portions not conducive to its theory of the case.

The Court reviews Colon-Fontanez's attendance record according to the documents submitted by the parties.[15]

---

[15] The attendance charts and graphs prepared by the Municipality's paralegal in preparation for trial are admitted pursuant to Federal Rule of Evidence 1006.

Although Colon-Fontanez argues for their exclusion, charts and graphs are precisely the sort of summaries allowed under Rule 1006 to avoid needless confusion and busywork. Colon-Fontanez argues that she was not given the absenteeism record summary referred to by the Municipality. The Municipality correctly points out that "only the underlying documents, and not the summaries, must be made available to the opposing party so as to give them a reasonable time to respond," Coates v. Johnson & Johnson, 756 F.2d 524, 550 (7th Cir. 1985) (internal citation omitted). Colon-Fontanez was given plenty of time to respond to the facts submitted by the Municipality. In fact, the Municipality served Colon-Fontanez the exhibits in support of its summary judgment motion in the conventional form by messenger on September 1, 2009 (see Docket No. 167), more than thirty days prior to the trial date set at that time of November 16, 2009. The sworn statement of the paralegal who prepared the summary charts and graphs goes into great detail about the documents relied upon and methodology used to develop the materials submitted to the Court. Further, the paralegal's name and position were announced to Colon-Fontanez on that same day, September 1, 2009. Finally, all of the underlying documents relied upon by the paralegal in preparation of the admitted summary charts and graphs were disclosed to Colon-Fontanez during discovery (See Docket No. 213 at 25).

If Plaintiff wished to dispute the attendance summaries and graphs submitted by the Municipality, which indicate that Colon-Fontanez was absent for a significant portion of her scheduled work days in many calendar years, she could have brought forth evidence showing, for example, that Colon-Fontanez in fact worked many more days than the Municipality alleged. The Court understands that the summary materials were prepared by the Municipality's counsel for trial purposes and will consider the credibility and weight of the prepared attendance charts and graphs with due knowledge of that and of the fact that the paralegal worked only with the documents available to her. For that reason, the Court views the percentages of attendance as approximations.

- **1992**

On August 14, 1992, the Municipality approved Colon-Fontanez's request for the advancement of eighteen (18) days of sick leave.  The Municipality denied Colon-Fontanez's request for advanced sick leave in a letter[16] to her dated September 4, 1992, because "advanced leave is a privilege provided by the Municipality to an employee, provided that they meet with certain basic requirements, among which it is required that they regularly comply with their work schedule."  The letter further explained that Colon-Fontanez's attendance record showed her to be "frequently absent" from her job, "presenting a pattern debt on account of sick leave."

- **1993**

During the year 1993 Colon-Fontanez was absent from work approximately twenty percent (20%) of the hours she was scheduled to work that year.  Approximately thirty percent of her absences were categorized as annual leave, and seventy percent of her absences were categorized as sick leave.

---

[16]  Colon-Fontanez objects to the admission of the letter, without citing any authority, on the basis that the letter constitutes inadmissible hearsay.  The Municipality contends, and the Court agrees, that the letter is admissible because it is a business record, allowed under Federal Rule of Evidence 803(6) "Records of Regularly Conducted Activity."  In addition, the letter is relevant not for the truth of the matter asserted, but for its effect on the recipient.

- **1994**

During 1994, Colon-Fontanez was absent from work fifty-nine percent (59%) of the total hours she was scheduled to work that year.  Ten percent (10%) of those absences were categorized as leave without pay; twenty-three percent (23%) were categorized as sick leave; two percent (2%) were annual leave; and sixty-five (65%) percent were without pay under the Corporation for State Insurance Fund ("CSIF").

A letter from the Municipality's Secretary for Administration, dated July 11, 1994 notified Colon-Fontanez that, as of June 30, 1994, she had exhausted her regular vacation allotment and owed two days pay as a result.  The letter informed Colon-Fontanez that the Municipality would discount her pay two days for the two days owed, and reminded her that, according to the Municipality's Personnel Regulations, it is the employee's duty and obligation to comply with regular and punctual attendance regulations in accordance with the established work schedule.

From June 13, 1994 through January 18, 1995, Colon-Fontanez was absent, due either to compensatory time, sick leave (charged to annual leave) or leave without pay.  Specifically, Colon-Fontanez was approved for leave without pay due to illness from July 19, 1994 through January 18, 1995.  On August 2, 1994,

Colon-Fontanez requested leave without pay starting on July 1, 1994, stating that she was under treatment by the CSIF.[17]

- **1995**

From January 31, 1995 through April 25, 1995, Colon-Fontanez was on leave without pay because she exhausted all of her leave.  On January 31, 1995, Colon-Fontanez requested an extension of her leave without pay for an additional six months alleging that she was still under treatment by the CSIF.  On February 27, 1995, Colon-Fontanez's application to be granted leave without pay while under CSIF treatment was approved for a duration of three months, from January 19, 1995 through April 18, 1995.  On April 27, 1995, the Municipality granted Colon-Fontanez's request for an extension of leave without pay because she was still reporting to the CSIF for health reasons.  The extension was effective from April 19 through April 25, 1995.  On December 18, 1995, Colon-Fontanez's paycheck was adjusted downward due to her absences.  On September 29, 1995, the Municipality sent a letter to Colon-Fontanez notifying her that, as of September 30, her leave would be exhausted and that continued absence would result in the docking of her next paycheck.  The letter also reminded Colon-Fontanez that employees must comply with the established work schedule by

_____

[17]  The parties do not dispute that an employee's treatment in the CSIF is designated under a separate category of leave.

"complying with punctuality and regularity with their work shift and work schedule."

In an evaluation of Colon-Fontanez's performance from July 1, 1995 through June 30, 1996, the reviewer for the Municipality's Office of Personnel and Labor-Management Relations observed that Colon-Fontanez surpassed the performance levels, but noted that she must continue to make additional improvement in the area of attendance. It further stated that she did not achieve the expected level of attendance.

- **1996**

With regard to her attendance, Colon-Fontanez's evaluation for the period July 1, 1995 through June 30, 1996 stated that: she did not reach the expected level of attendance; she needed to improve her pattern of attendance; she makes efforts to improve her attendance; and that she must continue to make additional efforts to improve her attendance. In all other areas of her evaluation (sociability, reliability, cooperation and integrity), Colon-Fontanez received the highest marks.

From March 16, 1996, through August 15, 1996, Colon-Fontanez was either on leave without pay, annual leave, or leave

pursuant to treatment under the CSIF.[18]  Colon-Fontanez requested

and was granted leave without pay without leave from May 16, 1996

through August 16 of that year due to treatment under the CSIF for

"injury in my left foot."   Colon-Fontanez was again on leave

without pay from November 15, 1996 through February 18, 1997.

■   **1997**

On January 27, 1997, Colon-Fontanez requested leave

without pay because "since last November 15, 1996, I have been

reporting to the State Insurance Fund to undergo a surgical

intervention of the knee on my left foot [sic]."   On March 13,

1997,[19] the Municipality discounted Colon-Fontanez's salary pursuant

to a form titled "Salary Discount on Account of Unauthorized

Absences and/or Tardiness."   In a section instructing the person

---

[18]   Confusingly, the Municipality's submitted exhibits show
that Colon-Fontanez was granted leave from April 23, 1996 through
August  15, 1996, but also that she was on leave from March 16,
1996 through August, 1996 applied to numerous leave categories
(leave without pay, Workers Accident Compensation, and vacation
leave).  See Docket No. 159, Exh. H-1, MSJ 467; Exh. A, Exhs. 11
and 81.  The Court cannot be sure exactly when Colon-Fontanez's
leave began and ended in 1996.  For the purposes of resolving the
motion for summary judgment, however, it is sufficient that the
plaintiff was on leave for an extensive portion of the 1996
calendar year.

[19]   The Court notes that the certified translation contained
a typo:  the Spanish language version marked the form's signature
date as March 13, 1995.  Although the Court does not consider
Spanish language documents, in this instance the numerical
information translated is the same in both languages and,
therefore, the Court's correction of a typographical error does not
risk any interpretive prejudice.  Further, Colon-Fontanez did not
object to the document's signature date (March 13, 1997) as
submitted by the Municipality.

filling out the form to "Explain in detail why you consider the absence(s) and/or late arrival(s) unjustified, it says "the employee was excluded on account of a leave without pay" and because Colon-Fontanez "improperly collected a check for the first bimonthly pay period of November, 1996."

- **2000**[20]

During the year 2000, Colon-Fontanez was absent approximately twenty-three percent (23%) of the time she was scheduled to work: forty percent (40%) of those absences were categorized as sick leave, and sixty percent (60%) were categorized as annual leave.

On February 15, 2000, the Municipality issued Colon-Fontanez a warning letter informing her that: (1) as of January 31, 2000, her leave balance was very low; (2) because her leave balance was low, she would be removed from the direct deposit program; (3) should she be again absent from work, she would not receive the next paycheck and the difference would be claimed from her;

_____

[20] The Municipality has not provided the Court with information regarding Colon-Fontanez's attendance for the years 1998 and 1999.  Colon-Fontanez asserts that the Court should therefore infer that the attendance records for those two years would have contained information against the Municipality's interest.  The Court makes no such inference, and finds the Colon-Fontanez's contention spurious.  If Colon-Fontanez wants to dispute the alleged facts, she may do so by citation to a supporting exhibit – and surely Colon-Fontanez could have researched her own attendance records or presented other facts in order to dispute the patterns of her absences that the Municipality hopes to show rather than asking the Court to draw unnecessary inferences from the gaps in the evidentiary record.

(4) under the new attendance system, "ORACLE," the days owed by an employee would be discounted from his or her salary instantly; and (5) the Personnel Regulations of the Municipality establish that job security is contingent upon regular and punctual attendance.

On May 25, 2000, the Municipality informed Colon-Fontanez in a letter that: (1) the Municipality's Personnel Regulations require regular and punctual attendance; and (2) as of April 31, 2000, Colon-Fontanez owed regular leave, such that any debt owned to the Municipality would be withheld from her salary.

In order to take care of her ill mother, Colon-Fontanez applied, on July 21, 2000, for the transfer of five days of vacation leave from another employee because her own leave balance was already exhausted.  The Municipality authorized the transfer.[21]

■   **2001**[22]

In 2001, Colon-Fontanez was absent from work approximately twenty-five percent (25%) of the time she was scheduled to work that year.  Of the time she was absent, Colon-

---

[21]   The parties dispute irrelevant issues regarding the Municipality's policy allowing employees to transfer leave hours to those whose leave is exhausted.  Whether employees regularly take advantage of the Municipality's leave transfer program is unrelated to the issue of whether Colon-Fontanez's attendance record disqualifies her from protection under the ADA.

[22]   The Municipality submitted an evaluation of Colon-Fontanez's work performance for the Court's consideration, but only portions of the evaluation were translated.  Because the translated portions of the evaluation are taken out of context, the Court will not consider the evaluation whatsoever.

Fontanez was on sick leave eighty-three percent (83%) of the time and on annual leave seventeen percent (17%) of the time.

On June 25, 2001, Colon-Fontanez requested authorization to transfer leave from other employees to her account because her leave balance (both for sick leave and annual leave) was already exhausted.  Colon-Fontanez claimed that she had undergone surgery on June 22, 2001, and that she had been told to rest until her follow-up visit on June 28, 2001.  On July 5 and August 3, 2001, the Municipality's Human Resources Director approved Colon-Fontanez's request for credited annual leave from other employees for the period of July 6 through July 13, 2001 and from July 17 through July 24, 2001.  On December 13, 2001, Colon-Fontanez again requested leave transferred to her from other employees because she was having health problems but had already exhausted her leave.

- ■    **2002**

Plaintiff was absent from work approximately twenty-one percent (21%) of her scheduled work time in 2002; sixty-nine percent (69%) of those absences were categorized as sick leave, eleven percent (11%) were categorized as annual leave, eight percent (8%) were categorized as compensatory time, and twelve percent (12%) were categorized as time donated by other employees.

On May 21, 2001, Colon-Fontanez requested that she be credited with leave time from other Municipality employees due to her health problems and because she had already exhausted her own

annual leave and sick leave balances.  The Municipality approved
her request for a total of seven days, from May 21 through May 24,
2002 and from May 29 through May 31, 2002.

- **2003**

   In 2003, Colon-Fontanez was absent approximately
twenty-five (25%) percent of the time she was scheduled to work
that year.  Sick leave constituted twenty-percent (20%) of her
absences; annual leave constituted seventeen percent of her
absences; sick leave charged to compensatory leave constituted
eight percent (8%) of her absences; and time donated by other
Municipality employees constituted the remaining eighteen percent
(18%) of her absences.

   Colon-Fontanez's evaluation from March 15, 2002 through
March 16, 2003 contains a comment regarding her punctuality and/or
attendance that "due to her health condition" she is prevented from
"attending with regularity."  On October 6, 2003, Colon-Fontanez
requested that she be credited with leave time from other
Municipality employees because of her health problems and because
she had exhausted her own annual leave and sick leave balances
already.

- **2004**

   In 2004, Colon-Fontanez was absent for approximately
nineteen percent (19%) of the time she was scheduled to work.  Sick
leave accounted for eighty-nine percent (89%) of those absences,

and annual leave accounted for eleven percent (11%) of those absences.

Colon-Fontanez's evaluation from March 15, 2003 through March 14, 2004 contains a comment regarding her punctuality and/or attendance that "due to her health condition" she is prevented from "attending with regularity." In other areas of performance, Colon-Fontanez received superior marks and positive comments.

- ■ **2005**

In 2005, Colon-Fontanez was absent from work thirty percent (30%) of the time she was scheduled to work that year. Colon-Fontanez's absences were categorized as leave without pay twenty-five percent (25%) of the time, sick leave twenty-one percent (21%) of the time, annual leave (with sick leave exhausted) twenty-two percent (22%) of the time, and annual leave thirty-two percent (32%) of the time.

On June 10, 2005, the Municipality issued Colon-Fontanez a letter informing her that the Municipality's Personnel Regulations establish that employees shall have job security provided that they fulfill certain criteria, including regular and punctual attendance and compliance with their regular work schedules. The letter further informed Colon-Fontanez that on May 31, 2005, her leave balance was getting low and further absences would result in a deduction from her paycheck to claim any debt from overpayment. On August 12, 2005, the Municipality issued

a letter to Colon-Fontanez that:  (1) cited an Executive Order requiring employees to comply with attendance rules and use of leave established by the Municipality; (2) informed her that her leave balance was low; and (3) stated that should she again be absent from work, "we will proceed to reimburse your check and claim the difference, if any."

Colon-Fontanez's evaluation for the period of September 1, 2004 through August 31, 2005 contains an unsatisfactory mark for attendance.  With regard to her attendance, the evaluation states that Colon-Fontanez "is not compliant, attendance is much below the established norms" and that her "Attendance record during the cycle is 13 absences or more in one year."  The evaluation also cites Colon-Fontanez for commendable performance in all other areas of the evaluation, and states that, due to her health condition, she is unable to attend work regularly but is improving.

- ■  **2006**

In 2006, Colon-Fontanez was absent approximately fifty-nine percent (59%) of the time she was scheduled to work. She was on leave without pay for fifty-eight percent (58%) of the time she was absent; on sick leave for twenty-two percent (22%) of the time she was absent; on annual leave for eleven percent (11%) of the time she was absent; on annual leave with sick leave exhausted for seven percent (7%) of the time she was absent; and on

advanced sick leave for two percent (2%) of the time she was absent.

On January 19, 2006, Colon-Fontanez requested leave without pay from the Municipality from January 1 through January 16, 2006 due to health problems.  On March 15, 2006, Colon-Fontanez requested three days of advanced sick leave from the Municipality because her leave balances were exhausted.  On April 1, 2006, Colon-Fontanez requested leave without pay from April 1 through April 30, 2006 due to her health issues, hospitalization, and because her leave was exhausted.  On October 2, 3006, Colon-Fontanez requested from the Municipality more periods of leave without pay from October 3 through 23, October 24 through 30 in 2006 and from November 2, 2006 through January 12, 2007 due to her health problems.  The Municipality approved all requests.

- **2007**

In 2007, Colon-Fontanez was absent approximately fifty-six percent (56%) of the time she was scheduled to work: forty-one percent (41%) of the time absent was categorized as leave without pay; seventeen percent (17%) was categorized as sick leave; one percent (1%) was categorized as advanced sick leave; three percent (3%) was categorized as annual leave; and thirty-five percent (35%) was categorized as leave without pay due to treatment under CSIF.

On May 24, 2007, Director of Purchases and Provisions[23] Ivonne Rodriguez ("Rodriguez") addressed a memorandum letter to the Municipal Secretary stating that Colon-Fontanez's absence had affected the Health Department's work, causing delays.  The letter requested additional support in the Health Department until Colon-Fontanez was able to return.

In a letter dated December 5, 2007, employee Yesiree Aleman O'Neill ("Aleman") states that she had been asked by Rodriguez to assist with pending matters while Colon-Fontanez was absent due to health problems.  In her letter, Aleman requested a transfer from the Auction Department to another division or department.[24]

- **2008**[25]

Colon-Fontanez was absent fifty-six percent (56%) of the time she was scheduled to work in 2008.  Of those absences, seventy-percent (70%) were categorized as leave without pay; eighteen percent (18%) were categorized as sick leave; eight

---

[23] Rodriguez was a supervisor of Colon-Fontanez for some of the periods relevant to this case.

[24] The Court takes note that these discussions regarding Colon-Fontanez's work performance occurred after her request for accommodation.  The December 5, 2007 letter was sent after Colon-Fontanez's complaint was filed in this case.

[25] The Municipality submitted additional facts to show that Colon-Fontanez's lengthy absences persist into the current calendar year of 2009, but the Court will disregard those facts because they are irrelevant to the following analysis.

percent (8%) were categorized as annual leave with sick leave
exhausted; and four percent (4%) were categorized as annual leave.

On September 9, 2008, the Municipality's Municipal Clerk,
Jose A. Alicea Rivera, issued Colon-Fontanez a memorandum that
cited the Municipality's regulations pertaining to attendance and
use of leaves of absence.  The letter further informed
Colon-Fontanez that, as of August 31, 2008, she had exhausted her
balance of regular leave and owed the Municipality as a result of
overpayment which would be deducted from her salary.  On October 2,
2008, Colon-Fontanez requested a three month leave without pay due
to her continuing health problems and because she had already
exhausted her leave balances.  On October 22, 2008, the
Municipality notified Colon-Fontanez that she would receive leave
without pay as requested, yet reminded her that her work requires
regular attendance.

From September 10 through September 24, 2008, following
the filing of Colon-Fontanez's complaint in this case, a number of
electronic messages were exchanged by various employees of the
Municipality concerning the impact of Colon-Fontanez's frequent
absences from work on the auction processes for the Department of
Health of the Municipality.

■    **Testimony Regarding Colon-Fontanez's Work Performance**

_____     In addition to the above-relayed facts regarding some of Colon-Fontanez's evaluations, the Court has assembled the following record related to Colon-Fontanez's work performance.

Julia Lanzo testified that Colon-Fontanez's work performance was excellent.  She testified that, in 2006, Colon-Fontanez's absences became more and more frequent.  Lanzo testified that Colon-Fontanez's family members sometimes called to notify her that Colon-Fontanez did not feel well and would be absent.  Lanzo said that when Colon-Fontanez returned to the office, she (Colon-Fontanez) continued doing the work as she did it prior to her absence.  Lanzo also stated that, although Colon-Fontanez sometimes came to the office swollen or sick, she would perform her tasks.  Lanzo said, "in that sense, I have no complaints about Nitza." Ivonne Rodriguez, on the other hand, testified that Colon-Fontanez's absences were often unannounced and that her attendance is totally unpredictable.  Yesiree Aleman testified that, although Colon-Fontanez could not carry a file without difficulty, she was able to carry out the immediate functions in her work area.

Colon-Fontanez maintains that her work was not delayed due to her absences.

Request for a Reserved Parking Space

On October 24, 2006, Colon-Fontanez wrote a letter to Special Assistant Jose Rivera Hernandez ("Rivera") requesting that she be

granted a reasonable accommodation for disabled persons pursuant to the Americans with Disabilities Act of 1990 in the form of a reserved parking spot close to the Municipal Tower building.  The letter stated that medical evidence and information was attached.

On or about November 1, 2006, Colon-Fontanez sent an electronic message to Rivera, on which Rodriguez, Lanzo[26] and Colomer were copied, following up on her reasonable accommodation request.  On November 2, 2006, Rivera sent Colon-Fontanez an electronic message informing her that a reserved parking spot could not be assigned.  If plaintiff had the handicapped person identification, however, she was welcome to use any of the six parking spaces assigned for the use of handicapped persons close to the building's entrance.[27]

At some point after November 2, 2006, Colon-Fontanez and Rivera had an informal conversation during which they discussed Colon-Fontanez's request for an assigned parking space.  Rivera testified in his deposition that, during his conversation with Colon-Fontanez, she informed him that she intended to file her case before the Office of the Advocate for the Disabled.  Colon-Fontanez did not send Rivera any written response to his November 2, 2006

---

[26]   Julia Lanzo was also one of Colon-Fontanez's supervisors during period relevant to this case.

[27]   On about August 16, 2008, the Department of Transportation (of the Commonwealth of Puerto Rico) issued Colon-Fontanez a handicapped person parking permit.

electronic message. Rivera stated in a deposition that he believed, because Colon-Fontanez did not respond to his November 2, 2006 message, that the matter had been resolved.

According to Rivera, in October and November of 2006, all of the reserved parking spots were assigned to various Municipality employees.

On March 28, 2007, Colon-Fontanez submitted a petition to the Office of the Advocate for the Disabled. The petition stated that, because of her health condition, Colon-Fontanez's physician told her that she could not walk long distances. The petition went on to say that on October 24, 2006 Colon-Fontanez requested an assigned parking space as a reasonable accommodation for her health condition. The petition stated that on November 2, 2006, an aide to the Municipal Clerk told Colon-Fontanez that he could not reserve a parking space, but that he offered her an alternative:[28] use of the reserved handicapped parking spots. Colon-Fontanez stated in the petition that the alternative offered was not viable for her, because by the time she arrived at work, all of the

---

[28] Plaintiff claims that her use of the word alternative was a mistake. Nevertheless, the Court admits to the record the fact that, in her petition to the Office of the Advocate for the Disabled, Colon-Fontanez did in fact use this word.

handicapped reserved spots were occupied.[29] Her petition requested that she be given reasonable accommodation in the form of an assigned parking space near the building where she was working.

<u>The Equal Employment Opportunity Commission Charge</u>

On June 18, 2007, Colon-Fontanez filed a "Notice of Charge of Discrimination" with the Equal Employment Opportunity Commission ("EECC") against the Mayor of the Municipality alleging discrimination pursuant to the ADA and retaliation for protected actions.  In her EEOC charge, Colon-Fontanez alleged that the violation against her was continuing, and cited the last violation as having taken place on May 17, 2007.

On August 31, 2007, the EEOC sent Colon-Fontanez notice of her right to sue.

<u>Facts Relevant to Colon-Fontanez's Retaliation Claims</u>

■  **Hazardous Workplace Conditions**

On April 11, 2007, a letter was issued to Municipal Secretary Jose Alicea ("Alicea") from the Commonwealth Department of Labor and Human Resources stating that a complaint had been filed concerning a possibly hazardous situation at the Municipal Tower. The Occupational Safety and Health Administration (OSHA) issued a

---

[29] Colon-Fontanez's supervisor, Julia Lanzo, testified that she generally arrived to work before 6:30 and the handicapped parking spots would be full upon her arrival.  The parties dispute this claim; whether the at-large handicapped spots were filled by the time Colon-Fontanez arrived to work, however, is not relevant to the Court's analysis.

"Notice of Alleged Safety or health hazards" which noted that a remodeling project with gypsum board was conducted while employees were present, exposing twenty (20) employees.  On April 17, 2007, Alicea sent a letter to OSHA Area Director Lydia Sotomayor ("Sotomayor") stating that the gypsum board construction ended on the same day that the original complaint of hazardous conditions was filed and that plastic covers were installed to contain any material granules.

On September 11, 2007, Sotomayor sent Colon-Fontanez a letter to follow-up on her complaint[30] regarding hazardous conditions at the Municipal Tower building.  The letter stated that, with regard to the remodeling work with gypsum boards while employees were present at the site, OSHA issued no summons because the condition was not observed.

■    **Statements Made to Colon-Fontanez**

Colon-Fontanez claims that three fellow employees told her to get on social security, and that her supervisor, Ivonne Rodriguez, told her numerous times, including one instance in June of 2007, to get on social security because then she would get an assured check.  Colon-Fontanez testified that all of these

---

[30]  There is no well supported fact submitted on this point; the Court may infer from other submitted facts, however, that Colon-Fontanez was the author of the OSHA complaint.

statements were made either during telephone calls or while she and Rodriguez were alone in Rodriguez's office.[31]

- **Changes in Colon-Fontanez's Work Schedule**

        In her amended complaint, Colon-Fontanez alleged that she requested a change in her work schedule in order to go to medical appointments, and that her supervisor, Ivonne Rodriguez, never answered her request, causing Colon-Fontanez to lose the balances of her sick and vacation leaves.  During a deposition, Colon-Fontanez testified that she did not recall whether or not Rodriguez followed up on Colon-Fontanez's request for a change in her working schedule.  Colon-Fontanez also testified during her deposition that her supervisor, Maria Marcano ("Marcano"), authorized a change in her schedule in March of 2008, accommodating Colon-Fontanez's medical appointments and avoiding any loss to Colon-Fontanez's leave balance.  On March 13, 2008, the Municipality authorized a change to Colon-Fontanez's work schedule.

- **Delayed Approval of Outlook Computer Training**

        Colon-Fontanez testified in her deposition that she was not allowed to participate in a computer training workshop because her request to participate was not approved with sufficient time.

---

        [31] Related to these facts, Colon-Fontanez refers the Court to exhibits which were submitted only in the Spanish language.  The Court again reminds the parties that it cannot rely upon documents that are not properly translated.  <u>Puerto Ricans for P.R. Party v. Dalmau</u>, 544 F.3d 58, 67 (1st Cir. 2008); Local Civil Rule 10(b).

In her deposition, Colon-Fontanez testified that she submitted her request to supervisor Rodriguez on August 23, 2007 for a workshop to be held on September 11, 2007, and that she did not follow up with Rodriguez.[32]  Although Colon-Fontanez stated that she did not follow-up with Rodriguez about the status of her request, she also stated that Rodriguez would not receive her for work consultations (implying that Rodriguez would not meet with Colon-Fontanez to follow up).

- **Negative Memorandum Against Colon-Fontanez**[33]

    In an undated sworn statement, Municipality employee Ruth Carmona[34] claimed that she was asked by Ivonne Rodriguez "for my advise [sic] in order to issue a disciplinary memo against Nitza Colon but I refused."  (See Docket No. 59-2 at 2)

- **Withholding Checks**

    The Municipality issued notices for the re-deposit or refund of Colon-Fontanez's pay checks for the following pay periods

---

[32]  Again, Colon-Fontanez directs the Court to documents not translated for the record; therefore, the Court will not consider them.

[33]  Colon-Fontanez again contests the facts submitted by the Municipality by citing to Carmona's testimony (Exhibit 39), which was never properly translated for this Court's consideration.  (See Docket No. 187-40)

[34]  Ruth Carmona identifies herself as holding the position of Administrative Official II.  Docket No. 59-2.  Colon-Fontanez testified that Carmona worked in the area of Human Resources. The exact title and function of Carmona within the Municipality's structure is not relevant to the Court's analysis.

during which her pay checks had been withheld because she either owed days and/or did not have sufficient sick or annual leave to cover the pay period: August 16 through 31, 2006; July 16 through 31, 2007; August 1 through 15, 2007; and August 16 through 31, 2007. It is unclear when, exactly, Colon-Fontanez's re-deposited or refunded checks were issued, or when she actually received her reimbursed or refunded payments.

On August 29, 2007, Colon-Fontanez sent an electronic message to Municipal Secretary Jose Alicea with the subject heading "Payroll Payment." In her e-mail Colon-Fontanez asserted that she had not received any type of payroll payment since July 20, 2007. She stated that she was aware that adjustments to her payment would have to be made due to her absences. That same day, Alicea forwarded Colon-Fontanez's electronic message to Human Resources Director Antonio Alvarez-Torres stating, "I request your help in processing this case promptly." The Municipality issued a check to Colon-Fontanez on that same day, August 29, 2007, for $328.51. The Municipality issued Colon-Fontanez fourteen payroll checks between May 31, 2007 and December 21, 2007 which were signed and cashed.

Employee Adela Otero, who works as an Administrative Officer II for the Municipality, testified that other employees were given refund checks by the Municipality while Colon-Fontanez was not given her check.

- **Elimination of Supervisory Duties**

Colon-Fontanez alleges that her supervisor, Ivonne Rodriguez, retaliated against her by eliminating supervisory duties and telling Colon-Fontanez that her duties were being eliminated because of her health condition.

Yesiree Aleman ("Aleman") testified that she began working for the Municipality in 1996, that she was assigned to the purchase unit until 2001, that in 2001 she was assigned to the Auction Department, and that her immediate supervisor was Julia Lanzo. Aleman testified that she worked as Colon-Fontanez's assistant in 2004, and that she was assigned by Rodriguez and Lanzo to be Colon-Fontanez's assistant because of Colon-Fontanez's health condition.

Colon-Fontanez testified that she supervised Aleman; she admitted, however, that she did not perform evaluations of Aleman's performance; evaluations of Aleman were done by the manager or director. Lanzo, who managed the Auction Area until 2006, testified in a deposition that she had directed Aleman to assist with work coverage when Colon-Fontanez was absent, ensuring that the work assigned to Colon-Fontanez would not be disrupted or cease during Colon-Fontanez's absences. Lanzo testified that it was impossible to predict when Colon-Fontanez would be absent. Lanzo also stated that she did not like Colon-Fontanez getting sick and failing to report to work, but that she would assist Colon-Fontanez by doing Colon-Fontanez's work to ensure that the work was done.

■   **Reassignment of Colon-Fontanez's Duties in the Women's Affairs Department**

Colon-Fontanez also claims that Rodriguez eliminated some of her work duties for the Department of Women's Affairs.  Yesiree Aleman testified that a change took place in 2007 after a personnel meeting in Ivonne Rodriguez's office.  Colon-Fontanez said that she never complained that she was unable to carry the workload from the Department of Women's Affairs, nor did she receive any complaints about her work for that Department.  Rodriguez claims that the Department of Women's Affairs work was not reassigned away from Colon-Fontanez because of her health condition; it was reassigned "to help Nitza Colon in meeting her work levels requirements . . . to give Nitza Colon breathing space so that she could otherwise manage her absenteeism situation." She said work in the Department of Women's Affairs was generally reassigned as part of the regular reassignments she does in the Auction Department to "get things moving."  Rodriguez further explained that the reassignments are done from time to time to meet manpower gaps in the Auction Department, and to keep the Auction Department on track, preventing a backlog of work.  Rodriguez also stated that the Department of Women's Affairs rarely produces work for the Auction Department nor does it require significant attention.

■   **Elimination of Advancement Opportunities**

Colon-Fontanez claims that she has not been evaluated since filing her request for reasonable accommodation, preventing

her advancement in the Municipality structure.  After her deposition
in this case, Colon-Fontanez, along with a number of other
employees, was evaluated by Ivonne Rodriguez, her supervisor.
Colon-Fontanez claims that she has been unable to procure the
results of the evaluation from Rodriguez.

A form letter sent to Colon-Fontanez in May of 2008
rejected her application for a position as an administrative aide
because she did not meet the necessary requirements.

Hostile Environment

Colon-Fontanez asserts that she was subjected to a hostile
environment as a consequence of filing her request for reasonable
accommodation.  Colon-Fontanez claims that Rodriguez failed to meet
with her and that she was isolated.  Rodriguez denies all of these
claims, stating that Colon-Fontanez has always been invited to
participate in work meetings when she attends work, that Colon-
Fontanez has never been isolated by the management in the Auction
Department, and that she never refused to meet with Colon-Fontanez.
Rodriguez also maintains that she has never discriminated against
Colon-Fontanez in any way, and instead has always tried to help
Colon-Fontanez with her attendance problem by being as flexible as
possible and providing alternatives so that Colon-Fontanez could
keep her job.

The following facts relate to Colon-Fontanez's hostile
environment charge.

- Yesiree Aleman testified in her deposition that after Colon-Fontanez requested a parking spot she was mistreated. Aleman claimed that, on one occasion, Rodriguez did not want to see Colon-Fontanez. Aleman further stated that when Aleman and Colon-Fontanez entered Rodriguez's office, Rodriguez yelled at them, telling them she was busy, but that when other employees entered Rodriguez's office, Rodriguez did not yell at them.

- Colon-Fontanez claims that she was thrown out of Rodriguez's office in front of another Municipality employee.

- Colon-Fontanez claims that Rodriguez allows other employees to come and go from her office, but makes Colon-Fontanez wait, avoids Colon-Fontanez, restricts Colon-Fontanez's access to her, and does not even say good morning to Colon-Fontanez. Colon-Fontanez claims that because Rodriguez did not take action to stop the hostility toward Colon-Fontanez, other employees stopped talking to Colon-Fontanez.

- According to Colon-Fontanez, one employee said she was a hypochondriac and Rodriguez took no action. Colon-Fontanez claims she was surprised at the way Rodriguez was treating her.

- Colon-Fontanez claims that in 2008 she was not invited to a contracts workshop she felt she should have been invited to attend.  Rodriguez denies that Colon-Fontanez was purposefully not invited to a contract workshop and states that Colon-Fontanez often participates in these kinds of activities.

- Colon-Fontanez claims that Rodriguez allows other employees to attend to personal matters during work hours, leaving work to do personal things, without deducting their hours, while always deducting Colon-Fontanez's hours in compliance with the employment manual.  Rodriguez denies this, stating that all employees are required to obey the same attendance and punctuality rules.

- Adela Otero testified in her deposition that at some point after Colon-Fontanez had returned from an absence due to her health condition, Colon-Fontanez worked without a telephone for at least two months, was not provided with other tools to carry out her work, and, in 2008, had her computer taken away[35] for several weeks to

---

[35] Strangely, Otero also testified that Colon-Fontanez "was without a computer and then they were cleaning the machines...". The Court notes that Colon-Fontanez leaves this part of Otero's testimony out, perhaps because one may infer from it that employee machines were periodically removed for the benign purpose of cleaning.

a month requiring Colon-Fontanez to do her work manually.
Rodriguez denies this, stating that no tools were
withdrawn unless it was for short periods of time when
machines needed repair.

- Otero claimed that in 2007 while Colon-Fontanez was out,
  Rodriguez offered Otero the position of Auction Officer,
  which Otero understood belonged to Colon-Fontanez.
  Rodriguez denies this, stating, "It is not true that I
  offered Adela Otero a position in order to bump or
  replace Nitza Colon."

- Yesiree Aleman testified that employee James Delgado
  would comment that Colon-Fontanez was "faking it." She
  also claims that Rodriguez and Marcano would say, "If
  plaintiff is so sick than [sic] why doesn't she apply for
  disability," and that another employee, "Ineabelle," said
  that Colon-Fontanez should apply for disability.

- Otero also claims that she overheard Rodriguez in about
  2008 and 2007 commenting that Colon-Fontanez did not have
  anything when Colon-Fontanez called in sick.

- Colon-Fontanez claims she told Rodriguez that things were
  not pleasant for her, and that she felt depressed and
  discriminated against, but that Rodriguez took no action.

- Colon-Fontanez claims that in November 2007 she asked
  Rodriguez to hold a meeting with her female co-workers to

address the comments made against her, but that Rodriguez
refused to hold a meeting for that purpose.

- Colon-Fontanez claims that Rodriguez told her on three
occasions to take social security because that would be
a sure check.  She claims these statements were made only
after she requested reasonable accommodation, in 2006 or
2007.

- Aleman claims that Rodriguez told her to go back to her
desk whenever she went to speak with Colon-Fontanez.
Aleman also claims that one of the reasons she asked to
be transferred out of the Auction Department was because
of the hostile environment there.  Rodriguez claims that
Aleman was overworked because of the continued absences
of Colon-Fontanez and that Aleman was tired of working
with Colon-Fontanez because she was overworked.
Rodriguez states that Aleman told her that she (Aleman)
did not like the auction process, which was another
reason Aleman asked to be transferred.

- Otero claims that "they" would not allow Colon-Fontanez
to go to the bathroom, and "they" would send someone to
look for Colon-Fontanez when she went to the bathroom.
Otero states that, "if I heard that someone was looking
for Nitza, I would go to the bathroom, because she was
always feeling sick."  Rodriguez maintains that it is not

true that she or Marcano limited Colon-Fontanez's movements or followed her.  On January 25, 2008, Colon-Fontanez sent supervisor Maria Marcano an electronic message thanking Marcano.  Colon-Fontanez thanked Marcano for taking action regarding Colon-Fontanez's complaint that maintenance workers had made negative comments about Colon-Fontanez after Colon-Fontanez reported a maintenance problem.

- ■   With respect to all of the hostile environment claims, Rodriguez denies mistreating Colon-Fontanez or Aleman in any way.  She maintains that she treated Colon-Fontanez at all times with consideration and respect; that she never saw anyone, employee or supervisor, humiliate Colon-Fontanez in any fashion; and that she never heard anyone make comments to Colon-Fontanez about social security benefits.

### III. Summary Judgment Standard

The Court's discretion to grant summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure.  The rule states, in pertinent part, that the court may grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

FED.R.CIV.P. 56(c); see also Santiago-Ramos v. Centennial P.R.
Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000).  The party moving
for summary judgment bears the burden of showing the absence of a
genuine issue of material fact.  See Celotex Corp. v. Catrett, 477
U.S. 317, 323 (1986).

Once a properly supported motion has been presented, the
opposing party has the burden of demonstrating that a trial-worthy
issue exists that would warrant the Court's denial of the motion for
summary judgment.  For issues where the opposing party bears the
ultimate burden of proof, that party cannot merely rely on the
absence of competent evidence, but must affirmatively point to
specific facts that demonstrate the existence of an authentic
dispute.  See Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 53 (1st
Cir. 2000).

In order for a factual controversy to prevent summary judgment,
the contested facts must be "material" and the dispute must be
"genuine."  Material means that a contested fact has the potential
to change the outcome of the suit under governing law.  The issue
is genuine when a reasonable jury could return a verdict for the
nonmoving party based on the evidence.  See Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 248 (1986).  It is well settled that
"[t]he mere existence of a scintilla of evidence" is insufficient
to defeat a properly supported motion for summary judgment.  Id. at
252.  It is therefore necessary that "a party opposing summary

judgment must present definite, competent evidence to rebut the motion." Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994).

In making this assessment, the Court "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging in all reasonable inferences in that party's favor." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). The court may safely ignore, however, "conclusory allegations, improbable inferences, and unsupported speculation." Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

## IV. Legal Analysis

Colon-Fontanez claims that the Municipality discriminated against her in violation of the ADA and the Rehabilitation Act by refusing to grant her request for accommodation and by retaliating against her for making that request.

**A.   Reasonable Accommodation Claim Pursuant to the ADA[36]**

The Americans with Disabilities Act ("ADA") prohibits covered employers from discriminating against a qualified individual on the basis of disability in regards to the terms, conditions and privileges of employment.  42 U.S.C. § 12112(a).  To "discriminate" under the ADA includes an employer's failure to make reasonable

---

[36]   Neither party mentions the fact that in September of 2008 Congress enacted the ADA Amendments Act, which by its own terms went into effect on January 1, 2009.  Pub.L. No. 110-325 (2008) ("ADA AA").  The overarching purpose of the act is to reinstate the "broad scope of protection" available under the ADA.  Id. at § 2(b).  Among other things, the ADA AA rejects the United States Supreme Court's interpretation of the term disability in Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 198 (2002) and Sutton v. United Air Lines, 527 U.S. 471, 492 (1999).  Id.  The Court need not concern itself with the ADA AA, however, because the amendments do not apply retroactively.

Where Congress passes an interpretive or restorative statute, such as the ADA AA, its "intent to reach conduct preceding the 'corrective' amendment must clearly appear."  Rivers v. Roadway Exp., Inc., 511 U.S. 298, 313 (1994).  The text of the ADA AA fails to make any mention of retroactivity.  For this reason the Court holds that Congress did not manifest a clear intent for the ADA AA to apply retroactively.  The Court also holds that the ADA AA acts to increase a party's liability for past conduct because it expands the category of those who might qualify as disabled under the ADA. In such a case, the "traditional presumption" applies to prevent retroactive effect absent clear congressional intent.  Landgraf v. USI Film Products, 511 U.S. 244, 280 (1994).  The Court's holding that the ADA AA does not apply retroactively to events occurring before the Act went into effect is consistent with every other opinion that this Court has reviewed in its survey of the case law on this matter.  See, e.g., E.E.O.C. v. Agro Distribution, LLC, 555 F.3d 462, 469 n.8 (5th Cir. 2009); Geoghan v. Long Island Rail Road, No. 06-CV-1435, 2009 WL 982451, at *8-9 (E.D.N.Y. April 9, 2009); Neal v. Kraft Foods Global, Inc., No. 08-CV-92, 2009 WL 799644, at *9-10 (D.Or. March 23, 2009); Burkhart v. Intuit, Inc., No. CV-07-675, 2009 WL 528603, *11 n.4 (D.Ariz. March 2, 2009); Rudolph v. United States Enrichment Corporation, Inc., No. 5:08-CV-00046, 2009 WL 111737, * 4-6 (W.D.Ky. Jan. 15, 2009).

accommodations for the known physical or mental limitations of an
employee with a disability who is otherwise qualified to perform the
essential functions of his or her job.  To evaluate a reasonable
accommodation claim pursuant to the ADA, the Court looks at whether
the plaintiff has shown that (1) she suffers from a disability
within the meaning of the statute; (2) she was a qualified
individual in that she could perform the essential functions of her
job with or without a reasonable accommodation; and (3) despite
knowing of her disability, the plaintiff's employer did not offer
her a reasonable accommodation.  See Calero-Cerezo v. U.S. Dep't.
of Justice, 355 F.3d 6, 20 (1st Cir. 2004)(internal citations
omitted).

Colon-Fontanez claims that the Municipality violated the
ADA by denying her request for a reserved parking space.  The
Municipality maintains, inter alia, that Colon-Fontanez fails to
satisfy the first element of her failure to accommodate claim
because she is not a qualified individual within the meaning of the
ADA.  Even assuming, arguendo, that Colon-Fontanez produced evidence
from which a rational jury could have found her "disabled" within
the meaning of the ADA, the Court agrees with the Municipality that
Colon-Fontanez was not a qualified individual under the ADA.

A qualified individual under the ADA is one who is able
to perform the "essential functions" of the position, in this case
the essential functions of an Auction Officer at the Municipality

of San Juan, either with or without "reasonable accommodation."
See, e.g., Garcia-Ayala, v. Lederle Parenterals, Inc., 212 F.3d 638,
646 (1st Cir. 2000).  An essential function is not a marginal
function but a "fundamental job duty of the employment position."
Ward, 209 F.3d at 34 (citation omitted).  Essential functions "may
be more encompassing than such core job requirements as an
employee's technical skills and experience, even including such
individual or idiosyncratic characteristics as scheduling
flexibility."  Id.

          The Municipality argues that Colon-Fontanez's absenteeism
prevented her from performing an essential function of her job:
attendance.  Colon-Fontanez seems to argue that her pervasive
absenteeism is irrelevant and prejudicial because it was not the
reason for the Municipality's denial of her request for a reserved
parking space:  "Plaintiff contends that by attempting to bring in
plaintiff's attendance record during the past 17 years is irrelevant
and prejudicial."  (Docket No. 180 at 10)  She explains that her
attendance record "has no probative value specially [sic] when the
attendance record was never the basis for the denial of reasonable
accommodation."  Id.

          Colon-Fontanez misunderstands some basics regarding the
ADA.  An employer's reasons for denying or granting a requested
accommodation has nothing to do with whether or not the employee is
a qualified individual under the ADA.  Even if her absenteeism were

tied to her fibromyalgia, which it was not, because it occurred prior to 2005, the "[i]nability to work for a multi-month period removes a person from the class protected by the ADA." Byrne v. Avon Products, 328 F.3d 379, 381 (7th Cir. 2003). "Gross attendance problems can prevent a disabled person from being qualified for a position even when the attendance problem is related in whole or in part to the disability." Castro-Medina v. Procter & Gamble Commercial Co., 565 F.Supp.2d 343, 369 (D.P.R.2008) (quoting 1 H.H. Perritt, Jr., Americans With Disabilities Act Handbook, § 3.06[E] at 124 (4th ed. 2003)); Cf. Garcia-Ayala v. Lederle Parenterals, Inc., 212 F.3d 638, 546 n.7 (1st Cir. 2000).

Indeed, the First Circuit Court of Appeals[37] recently held that "attendance is an essential function of any job." Ríos-Jiménez v. Principi, 520 F.3d 31, 42 (1st Cir. 2008) (holding that an employee who frequently missed work was not a qualified individual able to perform the essential functions of her job, either with or without a reasonable accommodation, as required to support disability discrimination and reasonable accommodation claims under the Rehabilitation Act). See also Leary v. Dalton, 58 F.3d 748 (1st Cir. 1995) (employee with excessive absences related to claimed

---

[37] Many federal courts have held that disabled employees must show regular and reliable attendance in order to establish sufficient performance of their essential job functions. For a summary of the relevant case law see Castro-Medina v. Proctor & Gamble Commercial Co., 565 F.Supp.2d 343, 370 n.15 (D.P.R. 2008).

disability was not qualified individual under the Rehabilitation Act).  "Simply put, 'one who does not come to work cannot perform any of his job functions, essential or otherwise.'"  Castro-Medina v. Proctor & Gamble Commercial Co., 565 F.Supp.2d 343, 370 (D.P.R. 2008) (internal quotation and citation omitted).

        The record clearly shows that Colon-Fontanez's absenteeism was pervasive and long-standing, going back many years prior to her diagnosis of fibromyalgia in 2005.  In fact, from the time she became a full-time employee in 1992, Colon-Fontanez's attendance record is startling.  In 1992, the Municipality approved Colon-Fontanez's request for the advancement of eighteen days of sick leave, but denied another request for advanced sick leave because Colon-Fontanez's attendance record showed her to be "frequently absent" from her job, "presenting a pattern debt on account of sick leave."  Colon-Fontanez was absent twenty percent of the hours she was scheduled to work in 1993 and fifty-nine percent of the total hours in 1994.  From January 31, 1995 through April 25, 1995, Colon-Fontanez was on leave without pay because she exhausted all of her leave.  From March 16, 1996, through August 15, 1996, Colon-Fontanez was on some sort of leave, due in part to "injury in my left foot." Colon-Fontanez was again on leave without pay from November 15, 1996 through February 18, 1997.  Colon-Fontanez was absent approximately twenty-three percent (23%) of the time she was scheduled to work in 2000; approximately twenty-five percent (25%) of the time she was

scheduled to work in 2001; approximately twenty-one percent (21%) of her scheduled work time in 2002; approximately twenty-five (25%) percent of the time she was scheduled to work in 2003; approximately nineteen percent (19%) of the time she was scheduled to work in 2004; and approximately thirty percent (30%) of the time she was scheduled to work in 2005, the year she was diagnosed with fibromyalgia.  Those absences have continued.[38]

According to Colon-Fontanez, "The fact that the [Municipality] never complained nor disciplined plaintiff after 17 years shows that it was never bothered by her absences," and "[i]t is only after the federal lawsuit was filed that all of the sudden, a couple of memorandums [sic] were delivered to the plaintiff by the same supervisors that made her employment life a living hell after she requested a reasonable accommodation."  (Docket No. 180 at 10) Although underscored with great theatrics, Colon-Fontanez's claim finds little support in the record.

The record is replete with the Municipality's documentation and disapproval of Colon-Fontanez's attendance

---

[38] Colon-Fontanez was absent approximately fifty-nine percent (59%) of the time she was scheduled to work in 2006; approximately fifty-six percent (56%) of the time she was scheduled to work in 2007; and approximately fifty-six percent (56%) of the time she was scheduled to work in 2008.  The Court notes that these absences have continued in 2009 as well.

problems:[39]  letters informing Colon-Fontanez that her pay would be docked due to overpayment following a period of unpaid leave; reminders about attendance policy requirements; and evaluations noting Colon-Fontanez unsatisfactory attendance and citing a need for improvement in the area of attendance policies.

Colon-Fontanez argues that her absenteeism did not affect the quality of her work.  Colon-Fontanez maintains that, despite these negative evaluations regarding attendance and the many letters reminding her of her duty to comply with attendance policies, she was always able to perform the essential functions of her job, demonstrated by the high marks she got on her evaluations in all areas other than attendance.  Colon-Fontanez claims that her work was never delayed, pointing out that her former supervisor, Julia Lanzo, testified that Colon-Fontanez's work performance was excellent and that, when in the office, Colon-Fontanez performed all of her duties.

_____

[39]   On May 24, 2007, Colon-Fontanez's supervisor, Ivonne Rodriguez, authored a memorandum stating that Colon-Fontanez's absence had affected the Health Department's work, causing delays and requesting additional support in the Health Department until Colon-Fontanez was able to return. Because this memorandum was authored after Colon-Fontanez made her request for accommodation, and because no others like it appear to have been authored during Colon-Fontanez's tenure, the Court believes it may have been written to support the Municipality's position in this case, showing that Colon-Fontanez's absenteeism created problems.  While the Court still credits the contents of the memorandum, it views the evidence apart from the memorandum as more than adequate to show that the Municipality was documenting and noting its disapproval of Colon-Fontanez's absenteeism.

Even assuming that Colon-Fontanez's quality of work was always excellent, and that she performed her duties well, the quality of Colon-Fontanez's work is not the determining factor in the Court's assessment of whether Colon-Fontanez sufficiently performed the essential functions of her job.  "In addition to possessing the skills necessary to perform the job in question, an employee must be willing and able to demonstrate these skills by coming to work on a regular basis." Tyndall v. National Education Centers, Inc. of California, 31 F.3d 209, 213 (4th cir. 1994). "Except in the unusual case where an employee can effectively perform all work-related duties at home, an employee who does not come to work cannot perform *any* of his job functions, essential or otherwise." Id. (emphasis in original) (internal quotation and citation omitted).

The position of Auction Officer is not one which can be effectively performed at home.  The Municipality's policies specifically require all its employees to attend work regularly and with punctuality and comply with the established work schedule. Although the Municipality allows for certain kinds of leave related, among other things, to illness, the Municipality's *Manual Regarding Work Schedule, Attendance Registry, Accrual and Use of Leave* allows the Municipality to take disciplinary measures when an employee incurs in a violation of established attendance norms and use of leaves of absence even when those absences are due to illness.  As

the record indicates, during many periods of her employment, the number of leave days taken by Colon-Fontanez far exceeded the amount of leave allowed by the Municipality, resulting in the docking of pay or other losses.

Colon-Fontanez's job duties as Auction Officer also specifically require her attendance.  The duties of an Auction Officer include tasks related to the preparation of bid proposals and contracts.  An Auction Officer must be physically present in the auction department; in fact, the auction papers apparently used in the course of business may not be removed from the auction office premises.  Colon-Fontanez does not dispute these requirements or provide facts which would counter them.  Nowhere does Colon-Fontanez state that she could perform her duties at home.  Neither does Colon-Fontanez offer any evidence rebutting the evidence submitted by the Municipality that demonstrates that attendance is not an essential function.  See Cabrera v. Sears Roebuck de Puerto Rico, Inc., 2009 WL 2461688, 6 (D.P.R. 2009)

Ironically, Colon-Fontanez contends that the Municipality "always recognized that plaintiff's absences were justified and excused" yet now "pretends to argue against the 17 years it consistently and favorably recommended and approved plaintiff's absences according to its own rules and regulations."  (Docket No. 180 at 13)  The Court agrees with Colon-Fontanez that, based on the record before it, the Municipality continually accommodated

Colon-Fontanez's various health issues (including caregiving for her
ill mother) throughout the length of her tenure, again and again
granting and extending leaves in excess of Colon-Fontanez's leave
balances.  (Colon-Fontanez correctly cites case law holding that
granting medical leaves may be a form of reasonable accommodation.)

        It is therefore odd that after so many years of being
granted excessive leaves, Colon-Fontanez now claims that the
Municipality suddenly discriminated against her for having an
illness.  It appears to this Court that the Municipality documented
carefully its disapproval of Colon-Fontanez's absenteeism, while
still accommodating her need to take medical leaves on a frequent
and prolonged basis - something that does not jive with Colon-
Fontanez's theory that the Municipality's refusal to give her an
assigned parking spot was motivated by discriminatory animus.

        Nevertheless, this claim turns on whether Colon-Fontanez's
excessive absenteeism disqualifies her for protection under the ADA.
Colon-Fontanez has failed to show a triable issue of fact regarding
her essential job functions.  Because attendance is an essential
function of Colon-Fontanez's job and because Colon-Fontanez's
attendance record was poor long before the onset and diagnosis of
her alleged disability, fibromyalgia, this Court finds that no
reasonable accommodation - and certainly not a reserved parking
space - would cure Colon-Fontanez's attendance shortcomings.
Accordingly, the Municipality's summary judgment motion is hereby

**GRANTED** as to Colon-Fontanez's reasonable accommodation claim under the Rehabilitation Act and ADA.[40]

**B.   Retaliation**

At the outset, the Court must clarify its position regarding the scope of Colon-Fontanez's retaliation claim.  The Municipality claims that Colon-Fontanez has amended her complaint to add over twenty-five new paragraphs with "a barrage of averment, workplace gossip and unsubstantial matters as new retaliation allegations." (Docket No. 216 at 22)  The Municipality also raises its "continuous objections to Plaintiff's intent of adding new alleged instances of retaliation that were not included in the complaint nor in the charge before the EEOC and that have the object of giving more color to plaintiff's ailing case of retaliation through the fabrication of an artificial scheme of retaliation." Id. at 23.

In her amended complaint, Colon-Fontanez alleges retaliatory actions which "include but are not limited to hostile environment, harassment, loss of benefits, elimination of significant responsibilities, persecution, hostility, humiliation, withholding of salary."  (Docket No. 48 at 13)  In her EEOC

_____

[40]   Given the Court's finding that Colon-Fontanez is not a qualified individual under the ADA, the Municipality's somewhat muddled assertions that the plaintiff failed to file her ADA claim in a timely manner and failed to exhaust her administrative remedies need not be addressed, nor does Colon-Fontanez's claim that the Municipality failed to engage her in an interactive process properly.

complaint, filed on June 18, 2007, Colon-Fontanez alleged that the violation against her was continuing, and cited the last violation as having taken place on May 17, 2007.  Colon-Fontanez failed, in her opposition to the motion for summary judgment, to specify which alleged actions correspond with each of the categories of retaliatory acts set forth in her amended complaint (such as "loss of benefits" or "harassment").  The Court will therefore do its best to determine how to categorize the array of retaliatory acts. Because many of the actions claimed to be retaliatory by Colon-Fontanez fit best under the general rubric of a "hostile environment," the Court will consider those actions in its hostile environment analysis below.  And because her EEOC complaint alleged a continuing violation, the Court will consider even the allegations made by Colon-Fontanez in the current calendar year, and the months leading to the writing of this opinion.

A plaintiff may assert a claim for retaliation, even where the underlying claim for disability discrimination fails, as Colon-Fontanez's does here.  <u>See</u> <u>Soileau v. Guilford of Maine, Inc.</u>, 105 F.3d 12, 16 (1st Cir. 1997) (citation omitted).  In the absence of direct evidence, as here, plaintiff must make a *prima facie* showing of retaliation by showing that (i) she undertook protected conduct, (ii) she suffered an adverse employment action, and (iii) that the two were causally linked.  <u>Carmona-Rivera v. Puerto Rico</u>, 464 F.3d 14, 19 (1st Cir. 2006).  A plaintiff may not carry a claim of

discriminatory retaliation simply by recounting that he complained and that he faced an adverse action.  <u>Kosereis v. Rhode Island</u>, 331 F.3d 207, 217 (1st Cir. 2003).  The plaintiff must also attach evidence of retaliatory behavior.  <u>Carmona-Rivera</u>, 464 F.3d at 20. In fact, "the adverse action must have been taken for the purpose of retaliating.  And to defeat summary judgment, a plaintiff must point to some evidence of retaliation by a pertinent decisionmaker." <u>Randlett v. Shalala</u>, 118 F.3d 857, 862 (1st Cir. 1997).  Requesting an accommodation constitutes protected conduct under the ADA's retaliation provision.  <u>Freadman v. Metro. Prop. & Cas. Ins. Co.</u>, 484 F.3d 91, 106 (1st Cir. 2007).

Colon-Fontanez has satisfied the first element because she requested reasonable accommodation for her alleged disability on October 24, 2006, and followed up her request in an electronic message on November 1, 2006.  The Municipality argues that Colon-Fontanez has failed to show that she suffered from any adverse action within the meaning of the retaliation provision. Specifically, the Municipality asserts in its reply brief that "Plaintiff has not been discharged, reprimanded, disciplined, suspended from employment, nor has she suffered any adverse action that may qualify as materially adverse and substantial."  (Docket No. 216 at 7)

###### 1.  Adverse Actions

"The term 'adverse employment action' arose in the Title VII context as a shorthand for the statutory requirement that a plaintiff show an alteration in the material terms or conditions of his employment." Bergeron v. Cabral, 560 F.3d 1, 7-8 (1st Cir. 2009) (internal citations omitted).  To establish a retaliation claim successfully, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).  "The alleged retaliatory action must be material, producing a significant, not trivial, harm." Carmona-Rivera v. Commonwealth of Puerto Rico, 464 F.3d 14, 19 (1st Cir. 2006). The First Circuit Court of Appeals has held that "adverse employment actions include 'demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees.'" Marrero v. Goya of P.R., Inc., 304 F.3d 7, 23 (1st Cir. 2002) (quoting White v. New Hampshire Dept. of Corrections, 221 F.3d 254, 262 (1st Cir. 2000)).

Despite these guidelines, determining whether an action is "adverse" "necessarily requires a case-by-case inquiry." Blackie v. Maine, 75 F.3d 716, 725 (1st Cir. 1996) (internal

citation omitted).  "'Context matters,' and 'the standard is tied

to the challenged retaliatory act, not the underlying conduct that

forms the basis of the Title VII complaint.'" Carmona-Rivera, 464

F.3d at 19. (citing Burlington Northern, 548 U.S. at 69-70).

Whether an action is sufficient to support a claim of retaliation

is judged objectively and depends on the particular circumstances

of the case.  Burlington Northern, 548 U.S. at 69; Marrero, 304 F.3d

at 23.

In this case, Colon-Fontanez must show that she

suffered a material, significant harm.  The Court considers each of

the alleged retaliatory actions, where recognizable,[41] in turn.

a.    **Changes in Colon-Fontanez's Work Schedule**

Colon-Fontanez alleges in her amended complaint

that she requested and was refused a change in her work schedule

from supervisor Rodriguez in order to go to medical appointments,

causing her to lose the balances of her sick and vacation leaves.

---

[41] In her opposition to the summary judgment motion, Colon-Fontanez states that she "suffered many adverse employment actions cognizable as retaliatory actions," then "re-adopts by reference her Statement of Uncontested Material Facts."  (Docket No, 180 at 26).   A plaintiff may certainly refer to facts stated in a separate, attached document, but a reference to facts does nothing to guide the Court's analysis regarding the alleged retaliation. Colon-Fontanez goes on to list twenty-three supposedly retaliatory acts; nowhere does she support her claim, however, that this list should be deemed adverse actions with any authority, case law or otherwise.  The Court is displeased because Colon-Fontanez has left the Court with the dirty work of going through each bare allegation of retaliation one by one with no law to ground its research.  As such, the Court gives those listed retaliatory actions the minimal attention each deserves.

During a deposition, however, Colon-Fontanez testified that she did not recall whether or not Rodriguez followed up on Colon-Fontanez's request for a change in her working schedule.  Colon-Fontanez also testified during her deposition that her supervisor, Maria Marcano, authorized a change in her schedule in March of 2008, accommodating Colon-Fontanez's medical appointments and avoiding any loss to Colon-Fontanez's leave balance.  On March 13, 2008, the Municipality authorized a change to Colon-Fontanez's work schedule.

Colon-Fontanez does not indicate when Rodriguez allegedly denied her request to change her work schedule, nor does she stand by her own assertion in her deposition.  In 2008, long after her request for reasonable accommodation, Colon-Fontanez's work schedule was changed to accommodate her medical appointments. The record therefore does not indicate that Colon-Fontanez suffered any adverse action as a result of her accommodation request, nor does the record indicate that the Municipality's decisions regarding her work schedule are linked whatsoever to her request.

**b.  Delayed Approval of Outlook Computer Training**

Colon-Fontanez alleges that she suffered an adverse employment action because her participation in a computer workshop was prevented due to her supervisor's delayed approval of Colon-Fontanez's request to participate in the workshop.  Colon-Fontanez stated that she did not follow up with Rodriguez about the status of her August 23, 2007 request; she also stated, however,

that Rodriguez would not receive her for work consultations (implying that Rodriguez would not meet with Colon-Fontanez to follow up).

Even if Rodriguez had intentionally prevented Colon-Fontanez's participation in a training workshop, which the record does not indicate, such an action would not constitute the kind of adverse employment action repudiated by the ADA.  A refusal by a supervisor to allow an employee's attendance at a workshop could constitute such an action if the employee could show that she experienced a material harm as a result.  See Carmona-Rivera, 464 F.3d at 19.

Yet, even were Colon-Fontanez to show that the delayed response to her request to attend a computer workshop meaningfully affected the conditions of her work, there is no evidence that her supervisor, Rodriguez, held up Colon-Fontanez's participation in the workshop because of Colon-Fontanez's request for accommodation.  The only possible argument Colon-Fontanez can make to show that the alleged action, Rodriguez's thwarting of Colon-Fontanez's participation in a workshop constitute an adverse employment action, is that it took place close in time to the protected activity.  The Supreme Court has stated that "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse action as sufficient evidence of causality uniformly hold that the temporal proximity must be very

close." Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001)(internal citation and quotation omitted). Rodriguez's alleged thwarting of Colon-Fontanez took place nearly a year after her request for reasonable accommodation on October 24, 2006, not close enough to link Rodriguez's action to any protected activity. See Calero-Cerezo v. United States Dept. of Justice, 355 F.3d 6, 25 (1st Cir. 2004) ("Three and four month periods have been held insufficient to establish a causal connection based on temporal").

### c. Negative Memorandum Against Colon-Fontanez

Colon-Fontanez claims that Municipality employee Ruth Carmona was instructed to write a disciplinary memorandum against Colon-Fontanez. What the record shows is only that, in an undated sworn statement, Ruth Carmona claimed that she was asked by Ivonne Rodriguez "for my advise [sic] in order to issue a disciplinary memo against Nitza Colon but I refused."

Not only does Ruth Carmona's statement lack a date, the timing of this alleged instruction - Rodriguez asking an employee to issue a disciplinary memorandum - is lacking. The Court is unable to determine when the alleged adverse employment action occurred. Even if the action occurred in close proximity to the filing of Colon-Fontanez's request for accommodation, there is no evidence that any disciplinary memorandum was ever issued or resulted in any materially adverse consequence to Colon-Fontanez.

###### d.    Withholding Checks

Colon-Fontanez appears to allege, albeit confusingly, either that the Municipality failed to issue her refund checks or delayed issuing her refund checks following periods during which her paychecks had been withheld because she either owed days and/or did not have sufficient sick or annual leave to cover the pay period. Colon-Fontanez does not specify in her opposition, however, which checks, exactly, were either unpaid or denied, or when she actually received her reimbursed or refunded payments.

The Municipality, on the other hand, submitted evidence regarding each instance in which Colon-Fontanez's paychecks were delayed or docked or otherwise irregular. On August 29, 2007, for example, Colon-Fontanez sent an electronic message to Municipal Secretary Alicea asserting that she had not received any type of payroll payment since July 20, 2007. Alicea forwarded Colon-Fontanez's electronic message the same day he received it to Human Resources Director Antonio Alvarez Torres stating, "I request your help in processing this case promptly." The Municipality issued a check to Colon-Fontanez on that same day, August 29, 2007, for $328.51. The record shows that the Municipality also issued Colon-Fontanez fourteen payroll checks between May 31, 2007 and December 21, 2007 which were signed and cashed.

The record does not support Colon-Fontanez's bare contention that she did not receive payment owed to her. Even

if the record showed a delay in payment, there is no indication from the evidence available that the delay or withholding of payment was unusual, or occurred only following Colon-Fontanez's reasonable accommodation request.  In fact, the Municipality had habitually docked Colon-Fontanez's payments, or sent her letters indicating that her next payment would be reduced, all as a result of her absenteeism, long before her request for a parking space.  If the Municipality did indeed dock or delay Colon-Fontanez's payment, the Court does not find any causal link between those actions and any protected activity.

### e.  Elimination of Supervisory Duties

Colon-Fontanez alleges that her supervisor, Ivonne Rodriguez, retaliated against her by eliminating supervisory duties.  The record shows that employee Yesiree Aleman was assigned to the Auction Department in 2001, her immediate supervisor was Julia Lanzo, and that she was assigned by Rodriguez and Lanzo to be Colon-Fontanez's assistant in 2004 because of Colon-Fontanez's health condition.  Colon-Fontanez testified that, although she supervised Aleman, she did not perform evaluations of Aleman's performance; evaluations of Aleman were conducted by the manager or director.  Lanzo testified in a deposition that she had directed Aleman to assist with work coverage when Colon-Fontanez was absent, ensuring that the work assigned to Colon-Fontanez would not be disrupted or cease during Colon-Fontanez's absences.  Lanzo

testified that it was impossible to predict when Colon-Fontanez would be absent. Nowhere on the record is there specific evidence about the removal of Aleman from Colon-Fontanez's supervision, or when this occurred.

A change in duties may, in some circumstances, amount to an adverse action; the alleged "elimination" of supervisory duties here does not. The record shows that the Municipality assigned an employee to assist Colon-Fontanez because of her health condition and to prevent the disruption of work that likely occurred due to her many prolonged absences. Colon-Fontanez brings forth no evidence showing that her position gave her supervisory authority such that the elimination of that authority fundamentally changed her role, status, or responsibility within the Municipality's structure. In this case, the assignment of Aleman to Colon-Fontanez's supervision appears more like an accommodation of Colon-Fontanez's health problems and assistance in her work responsibilities than a change to her position as Auction Officer. No corresponding raise was given to Colon-Fontanez for supervising Aleman, and no reclassification of job title was made. Colon-Fontanez was not demoted, reclassified or given less payment as a result of any removal of Aleman from Colon-Fontanez's supervision. Colon-Fontanez suffered no loss in prestige, and her displeasure at a personnel action does not render that action materially adverse. See, e.g., Blackie v. Maine, 75 F.3d 716, 725 (1st Cir. 1996).

### f.    Reassignment of Colon-Fontanez's Duties in the Women's Affairs Department

Colon-Fontanez also claims that Rodriguez eliminated some of her work duties for the Department of Women's Affairs.  Yesiree Aleman testified that a change took place in 2007.  Rodriguez claims that the Department of Women's Affairs work was not reassigned away from Colon-Fontanez because of her health condition; it was reassigned "to help Nitza Colon in meeting her work levels requirements . . . to give Nitza Colon breathing space so that she could otherwise manage her absenteeism situation."  She said that work in the Department of Women's Affairs was generally reassigned as part of the regular reassignments she does in the Auction Department to "get things moving."  Rodriguez further explained that the reassignments are done from time to time to meet manpower gaps in the Auction Department, and to keep the Auction Department on track, preventing a backlog of work.

Again, the Court finds that Rodriguez's reassignment of Colon-Fontanez's responsibilities related to the Department of Women's Affairs does not amount to the kind of material loss that would dissuade an employee from making a charge of discrimination.

### g.    Elimination of Advancement Opportunities

Colon-Fontanez claims that she has not been evaluated since filing her request for reasonable accommodation, preventing her advancement in the Municipality structure.  After her

deposition in this case, Colon-Fontanez, along with a number of other employees, was evaluated by Ivonne Rodriguez, her supervisor. Colon-Fontanez claims that she has been unable to procure the results of the evaluation from Rodriguez.  A form letter sent to Colon-Fontanez is May of 2008 rejected her application for a position as an administrative aide because she did not meet the necessary requirements.

Although the First Circuit Court of Appeals includes "refusals to promote" and "unwarranted negative job evaluations" as possible adverse employment actions, Hernandez-Torres v. Intercontinental Trading, Inc., 158 F.3d 43, 47 (1st Cir. 1998) (internal citations omitted), Colon-Fontanez has submitted no evidence that she was refused a promotion as a result of unfavorable or nonexistent evaluation.  She has failed to contextualize her assertion that Rodriguez did not evaluate her:  the Court has no idea how often Municipality employees, or those holding Colon-Fontanez's position, are supposed to be evaluated, and whether the time lapse between her evaluation was normal.  Without such a context, showing that Colon-Fontanez was singled out, there is no link between Rodriguez's failure to evaluate Colon-Fontanez for an undeterminable amount of time and Colon-Fontanez's request for accommodation.

*****

To summarize, the evidence, even when viewed in the light most favorable to Colon-Fontanez, is insufficient to prove that, viewed objectively, Colon-Fontanez's request for accommodation generated any adverse action against her.

### 2.   Hostile Environment

A hostile work environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." See Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (internal citations and quotations omitted).  In this case, Colon-Fontanez alleges that the Municipality retaliated against her by subjecting her to a hostile environment.

To prove a hostile work environment, Colon-Fontanez must show that she was subjected to severe or pervasive harassment that materially altered the conditions of her employment.  See Faragher v. City of Boca Raton, 524 U.S. 775 (1998) (citing Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986) (additional citation omitted)).  The harassment must be both objectively and subjectively offensive such that a reasonable person would find it hostile or abusive, and the victim must also perceive the conduct in question to be hostile or abusive.  Faragher, 524 U.S. at 787 (citing Harris v. Forklift Systems, Inc., 510 U.S. 17, 21-22 (1993)).

There is no "mathematically precise test" for determining if conduct reaches the threshold of being so severe or pervasive that it creates a work environment abusive to employees. Harris, 510 U.S. at 22-23. To determine if a reasonable person would find a work environment hostile or abusive, a court must consider the totality of the circumstances. Id. at 23. "These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. "The thrust of this inquiry is to distinguish between the ordinary, if occasionally unpleasant, vicissitudes of the workplace and actual harassment." Noviello, 398 F.3d at 92 (citation omitted). For example, "'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" Faragher, 524 U.S. at 788 (citing Oncale v. Sundowner Offshore Servs, Inc., 523 U.S. 75, 82 (1998).

The Court need go further than reciting the standard required to establish why Colon-Fontanez's claim fails. Colon-Fontanez alleges no more than what may be considered offhand comments and isolated incidents of a nature too mild to withstand summary judgment.

Colon-Fontanez claims that the Municipality exposed her to a hazardous workplace condition in early 2007. Regarding a

complaint filed by Colon-Fontanez about the workplace conditions, the Occupational Safety and Health Administration (OSHA) issued a "Notice of Alleged Safety or Health Hazards" which noted that a remodeling project with gypsum board was conducted while employees were present, exposing twenty (20) employees.  According to a follow-up letter sent by Municipal Secretary Alicea to OSHA Area Director Lydia Sotomayor, the gypsum board construction ended on the same day that the original complaint of hazardous conditions was filed and that plastic covers were installed to contain any material granules.

Nothing in this record suggests that the Municipality intentionally exposed Colon-Fontanez to harm or hazard; in fact, the ensuing OSHA investigation indicates that at least twenty employees were exposed to the gypsum project at issue.

Colon-Fontanez claims that three fellow employees told her to get on social security, and that her supervisor, Ivonne Rodriguez, told her numerous times to get on social security because then she would get an assured check.  Colon-Fontanez claims that she was thrown out of Rodriguez's office in front of another Municipality employee and that Rodriguez allows other employees to come and go from her office, but makes Colon-Fontanez wait, avoids Colon-Fontanez, restricts Colon-Fontanez's access to her, and does not even say good morning to Colon-Fontanez.  According to Colon-Fontanez, one employee said she was a hypochondriac, and another

said she was "faking it."  Colon-Fontanez claims that Rodriguez took

no action to stop the hostility toward Colon-Fontanez, even when

Colon-Fontanez asked her to address it.  Yesiree Aleman also

testified as to her discomfort about the hostility in the office.

Colon-Fontanez also claims that Rodriguez allows other employees to

attend to personal matters during work hours, leaving work to do

personal things, without deducting their hours, while always

deducting Colon-Fontanez's hours in compliance with the employment

manual.  Rodriguez denies this, stating that all employees are

required to obey the same attendance and punctuality rules.

Adela Otero testified in her deposition that Colon-

Fontanez worked without a telephone for at least two months, was not

provided with other tools to carry out her work, and, in 2008, had

her computer taken away for several weeks to a month requiring

Colon-Fontanez to do her work manually.  Rodriguez denies this,

stating that no tools were withdrawn unless it was for short periods

of time when machines needed repair.

Otero also claimed that Rodriguez offered Otero the

position of Auction Officer, which Otero understood belonged to

Colon-Fontanez.  Rodriguez denies this, stating, "It is not true

that I offered Adela Otero a position in order to bump or replace

Nitza Colon."

Otero further claimed that "they" would not allow

Colon-Fontanez to go to the bathroom, and "they" would send someone

to look for Colon-Fontanez when she went to the bathroom.  Rodriguez
denies that anyone limited Colon-Fontanez's movements or followed
her.

It is clear is that Colon-Fontanez and Rodriguez had
a difficult and perhaps uncivil relationship.  The uncomfortable and
tense relationship between Colon-Fontznez and Rodriguez (and other
employees in the Auction Department), however, does not establish
the kind of pervasive and severe hostility resulting from protected
activity as required to sustain a hostile environment claim.
Generally, stray remarks made in the workplace do not alone
constitute probative evidence that the preferred explanation for an
employment decision was pretextual.  "Mere generalized 'stray
remarks,' arguably probative of bias against a protected class,
normally are not probative of pretext absent some discernible
evidentiary basis for assessing their temporal and contextual
relevance."  Straughn v. Delta Airlines, Inc., 250 F.3d 23, 36 (1st
Cir. 2001) (internal citation omitted).

Moreover, a supervisor's poor judgment and general
lack of civility and disregard for professionalism may have created
an unpleasant working environment for Colon-Fontanez, and the
comments made by her colleagues may have been made in poor taste,
"but a supervisor's unprofessional managerial approach and
accompanying efforts to assert her authority are not the focus of
the discrimination laws."  Lee-Crespo, 354 F.3d at 46-47.  The fact

that Colon-Fontanez could have felt upset, punished, retaliated against, stigmatized, saddened, angry, indignant, or any other sort of emotion because of her tense relationship with her supervisor or rude style of communication is not enough.  See <u>Flaherty v. Gas Research Institute</u>, 31 F.3d 451, 456 (7th Cir. 1994) (a "bruised ego" is not enough).

The behavior complained of here simply does not rise to the level contemplated by ADA protections.  For these reasons, Colon-Fontanez's hostile working environment claim is **DISMISSED.**

## V.    Supplemental Commonwealth Law Claims

Because no federal claims remain to ground jurisdiction in this case, Colon-Fontanez's Commonwealth law claims against the Municipality are **DISMISSED WITHOUT PREJUDICE** pursuant to 28 U.S.C. § 1367(c)(3).

### Conclusion

For the reasons provided above, the Court **GRANTS** the Municipality of San Juan's motion for summary judgment:  the Court **DISMISSES WITH PREJUDICE** Colon-Fontanez's claims of disability discrimination and retaliation raised pursuant to the ADA and the Rehabilitation Act; and the Court **DISMISSES WITHOUT PREJUDICE** Colon-Fontanez's Commonwealth law claims.  Judgment shall enter accordingly.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, December 2, 2009.

<u>s/ Francisco A. Besosa</u>
FRANCISCO A. BESOSA
UNITED STATES DISTRICT JUDGE